## PINCKLEY et ux. v. TEXAS & P. RY. CO.*

### No. 5107.

Court of Appeal of Louisiana. Second Circuit.

Feb. 5, 1936.

Spencer, Gidiere, Phelps & Dunbar, of New Orleans, and Peterman, Dear & Peterman, of Alexandria, for appellant.

Stephens & Gahagan, of Natchitoches, and Harper F. Willis, of Rodessa, for appellees.

TALIAFERRO, Judge.

Plaintiffs, the mother and father of Ralph Pinckley, deceased, bring this suit against the Texas & Pacific Railway Company to recover damages for his death; it being alleged and admitted that he was run over and killed by a northbound passenger train of defendant, a short distance south of the corporate limits of the city of Natchitoches, La., about 5 o'clock the morning of January 28, 1934.

The negligence and carelessness charged against the operatives of the train are these: Running the train at a greatly excessive rate of speed, considering the neighborhood where the accident occurred, and its proximity to the corporate limits of the city of Natchitoches; by not keeping a proper lookout; and by not having the train under proper control.

*Rehearing denied March 3, 1936.

In amplification of these general averments, petitioners set up that the train which killed Pinckley was going north; that the track was straight for miles south of the place of accident; that the track there was daily used by pedestrians going to and returning from the city; that the neighborhood was thickly settled; and that it was the duty of the trainmen, after observing their son on the track, to stop the train.

In the alternative, plaintiffs contend that if it should be held that the negligence of deceased to any extent contributed to his death, in that case the defendant's agents and employees, in charge of the train, had the last clear chance to avoid the accident and failed to avail themselves of it.

Defendant denies that young Pinckley was killed from any negligence or carelessness on the part of the operatives of its train, and affirmatively alleges that said train was at the time properly equipped and operated, and was being run at a rate of speed permitted by law and its own rules. Alternatively, the negligence of deceased is urged as a bar to plaintiffs' recovery, should it be found and held that deceased in any manner or to any extent met death because of fault or negligence on the part of defendant's agents or employees.

This appeal is prosecuted by defendant from a judgment in favor of plaintiffs for $5,100. Increase in the amount of the award is prayed for by appellee.

There is virtually no dispute over the material facts of the case. We experience no difficulty in arriving at the conclusion that the deceased, Ralph Pinckley, met death solely from his own gross negligence; and therefore defendant, being free from fault, was improperly sued by his parents.

Deceased, who was 24 years old, and Miss Helen Hudson, age 19, attended a dance at a night club 7 miles south of the city of Natchitoches, and left there, walking, at an early hour the morning of January 28, 1934, en route to the city, where they lived. They were picked up by a passing car and carried to Gongre crossing, 968 feet below the place where they were both run down and killed. They left the car at the crossing, expressing the intention of waiting for some one else to join them. This party doubtless never came, and they resumed their journey afoot toward home. They were seen no more by any one, until the girl was recognized by the fireman and engineer when the train, going at the rate of 60 miles per hour, was not over 200 feet from her. The girl was then in a sitting posture, her knees encircled and drawn together by her arms and hands, her head resting on the knees. Pinckley, at the time, was close to and beyond Miss Hudson, and was not seen at all by the trainmen until after the tragedy. He was probably lying down.

The testimony of the fireman and engineer discloses that the lights on the locomotive, in keeping with the requirements of the Interstate Commerce Commission, well illuminated the track ahead for 800 feet, and that within this distance, persons erect on the track may easily be recognized as such, but that said train, moving at 60 miles per hour, could not be stopped under 1,800 feet, and was not, in this instance, stopped before going that far after the accident; that the customary signal was given, two long and two short blasts of the whistle, before reaching Gongre crossing, and that at this time the bright headlights of an automobile coming toward them obscured their vision up the track until the car passed them, at which time the train was not over 200 feet from the deceased; and that the girl's body was reduced to such a small size that at first they thought it was a bundle of paper on the track and only discerned it to be a woman when about 100 feet away. The brakes of the train were immediately applied, the gong sounded and whistle blown, as in case of alarm, but these did not in the least arouse the young lady or the deceased. They were evidently dead asleep from exhaustion and the night's dissipation. These alarm signals were heard by many persons living in the neighborhood. The fact that the train's operatives did not see Miss Hudson until the train was so close to her does not affect the situation. Had she been recognized 800 feet away, the result would, in all probability, have been the same. The train could not have been stopped in time to avert running her down. If the alarm signals did not arouse her and Pinckley when only 100 feet away, they would not have done so if given at a greater distance from them.

The accident occurred at 1,875 feet from the corporate limits of the city of Natchitoches. Immediately after passing the Gongre crossing, the engineer began to take steps to slow the train down so as

to comply with a law requiring trains to go not over 25 miles per hour through the city. This could be easily done within the distance to the city's limits. There is no law or rule of the company limiting the train's speed as it approached the city. From New Orleans to Shreveport, defendant's passenger trains are scheduled to run 60 miles per hour, except in cities, towns, or localities having laws forbidding such speed. Therefore, unless conditions, with reference to population, residences, traffic, etc., in and about the locus of this unfortunate tragedy, demanded that trains be driven through it in the nighttime at a lesser rate of speed than that fixed by defendant's regular schedule, it is not tenable to say that a duty resting upon it, in this respect, was violated by the train's speed of 60 miles per hour. The fact that many pedestrians chose to walk on the tracks, instead of the paths and graveled highway parallel thereto, certainly imposed no duty upon defendant to slow its trains down for the convenience and safety of such people. If this were not true, train schedules could not accurately be observed and the efficacy of their service to the public would be materially impaired. Schedules would have to be altered and revised as often as and when the members of a community drifted into a general use of the train tracks for purposes of foot travel. It would be to subordinate a railway company's private rights and property to the convenience and, to some extent, control, of such pedestrians.

Deceased was killed in what might be accurately termed a suburb of the city of Natchitoches. There are perhaps a dozen residences, at various distances from the track, within a radius of one-fourth of a mile of the spot where the accident occurred. Other buildings are within said distance. It is because of the presence of these residences and other buildings, and the generally improved condition of the surrounding area, that plaintiffs strenuously urge and argue that it was negligence for defendant's train to be operated at the rate of 60 miles per hour through this locality. It is not pointed out, however, with any degree of certainty, how this complained of speed contributed to the accident, nor is it apparent to us that the accident would not have occurred had the train's speed been much less.

Plaintiffs cite and rely upon the following Louisiana cases to sustain their position: Blackburn v. Louisiana R. & N. Co.,

144 La. 520, 80 So. 708; Jones v. Mackay Tel. Cable Co., 137 La. 121, 68 So. 379; Jones v. Chicago, R. I. & P. Ry. Co., 162 La. 690, 691, 111 So. 62; McClanahan v. Vicksburg, S. & P. Ry. Co., 111 La. 781, 35 So. 902; McGuire v. Vicksburg, S. & P. Ry. Co., 46 La.Ann. 1543, 16 So. 457; Gibson v. Texas & P. Ry. Co., 10 La.App. 678, 121 So. 382, 383.

The facts of all these cases are easily differentiated from those of the case at bar. We shall not encumber this opinion with an analysis of them.

It is true that the court held in the Blackburn Case that if the train was being run at night at such a rate of speed that it could not be stopped within the distance objects on the track could be seen, such was or could have been the proximate cause of the accident. However, while the rule here laid down may have had application to the peculiar facts of that case, it does not have general application. To apply it to railroads generally would materially impair the efficiency of the operation of their passenger trains and work inconvenience and hardship on the general public. Del Buono v. Illinois Cent. Ry. Co., 12 La.App. 35, 124 So. 694; Mongogna v. Illinois Cent. Ry. Co., 115 La. 597, 39 So. 699; Boyd v. Kansas City, S. & G. Ry. Co. (La.App.) 147 So. 100; Campbell & Co. v. Texas & P. Ry. Co. (La.App.) 152 So. 351; Jeter v. Texas & P. Ry. Co. (La.App.) 149 So. 144.

The rule finds proper application to automobiles.

Deceased had lived in the city of Natchitoches for many years. The train that killed him was running on schedule. The night was dark. Some rain had fallen in the early part of the night; and the atmosphere was charged with light mist. He undoubtedly knew that a fast passenger train was due to pass over this track soon after he and his companion chose it as a place for repose; and, in so doing, he became a trespasser and was guilty of negligence of the grossest sort. He thereby assumed the extraordinary duty of exercising the utmost vigilance and care for his own safety. Falling asleep merely aggravated his carelessness. He chose the most dangerous of several routes toward his home.

In Chargois v. Morgan's L. & T. R. & S. S. Co., 148 La. 637, 87 So. 499, the court, in sustaining an exception of no cause and no right of action, said: "Ac-

·cording, therefore, to his· own unqualified allegation, plaintiff, when injured, had deliberately chosen, for pedestrian use, a road especially constructed for the use of vehicles propelled by steam over iron rails, and which were to be expected at any moment to approach him from either front or rear, which cannot be operated over any ·other kind of road, are not so readily controlled, and hence are more dangerous to those who place themselves in their way than other vehicles, operated on other roads, although it is to be presumed that other roads, intended for other vehicles and for pedestrian use, were open to him; and, having done so, it is inferred, in the absence of any allegation to the contrary, *that he exercised no precaution whatever, either in the way of looking or listening for the approach of a train, but left the matter of his protection from the danger to which he had thus subjected himself entirely to the vigilance of defendant's employees, up to the very moment* of the accident. The allegation thus made is therefore irreconcilable with the allegation that the accident was attributable solely to the negligence of defendant and its agents, and that defendant in no way contributed thereto; for, if it be negligence for one not to look and listen before going upon a railroad track (as is well settled), it is equally, if not more, negligent, for one to make pedestrian use of such track, continuously, without looking and listening." (Italics ours.)

In Fils v. Iberia, St. M. & E. R. Co., 145 La. 544, 82 So. 697, 699, the court, in rejecting suit for damages by the tutor of minor children of a man killed by defendant's train, said: "But, although a railroad company may not be able to prevent the use of its track as an ordinary road· or street, it is not therefore to be presumed that it invites or consents to such use, and it is known of all men that the ordinary road or street is much safer for pedestrian and ·vehicular use. Even, then, though a pedestrian may, without being a trespasser, choose the track of a railroad as his road of travel, in preference to other routes provided for pedestrians, he thereby voluntarily subjects himself to certain inevitable risks, and, in so doing, is guilty of negligence which may be, and ordinarily is, much greater than that of the engineer, who, using the road for the purpose for which it was built, fails to see him, or to determine his condition, or to stop his lo-

comotive, in the least time or distance within which, by the most alert exercise of his faculties and of the means at his demand, the seeing, determination, or stopping would be possible."

■ If defendant is to be held liable in damages in cases of this character, it may only be done upon the theory that in operating its trains at night, through this suburban area, the imperative duty rests upon it to maintain only such a rate of speed that a train can be brought to a dead stop within 800 feet. We do not think it is under such a duty. In the present case, even though we concede that this duty rested upon defendant, the fact that the trainmen's vision up the track was obscured by the lights of the approaching automobile for nearly 1,000 feet, and until the train was within 200 feet of the couple, affects the situation materially and removes the case from the supposed rule.

In Houston v. Vicksburg, S. & P. R. Co., 39 La.Ann. 796, 2 So. 562, it was held:

"Where the speed of railway trains is not regulated by statute, unless in exceptional cases, the existence of a high rate of speed does not argue a fault on the part of the company.

"The reasonable rule is that the highest rate of speed consistent with the safety of the passengers is proper and legitimate.

"A person cannot recover for an injury to which he has contributed by his own want of ordinary care."

See Campbell v. Texas & P. Ry. Co. (La.App.) 152 So. 351, and Davis et al. v. Alexandria & W. Ry. Co., 152 La. 898, 94 So. 436.

In Winfiele v. Texas & P. R. Co. (La. App.) 150 So. 43, it was held that it was not negligence for a railway company to run its trains at a speed of 57 miles per hour through a hamlet consisting of three stores, a cotton gin, a potato house, cane derrick or rack, three residences and five tenant houses. Many more cases to the effect of these could be cited.

A part of the syllabus in Schexnaydre v. Texas & P. Ry. Co., 46 La.Ann. 248, 14 So. 513, 49 Am.St.Rep. 321, reads as follows: "Where a party goes on a railroad track for the purpose of using it as a highway, he, to a certain extent, assumes all risks, and it would be very gross negligence, amounting to malice, to render the railroad company liable to him; and this rule applies with greater reason when

the injured party has a safer mode of travel by a public highway."

In Johnson v. Texas & P. Ry. Co., 16 La.App. 464, 133 So. 517, 135 So. 114, we discussed at length and reviewed an array of cases pertinent to the principles we are now considering.

█ We therefore conclude and hold that the defendant was free of fault in the operation of the train in this case, at the time and place of accident, at the rate of 60 miles per hour, and for this reason, no liability attaches to it for the death of Pinckley; and, if it be conceded that it was negligence to operate said train at said speed at said time and place, then we hold that the gross contributory negligence of the deceased, to the moment of his death, bars recovery by plaintiffs; and, third, we hold that, if it be conceded that said train should have been driven at a speed at which it could have been stopped within 800 feet, no liability attaches for not doing so, because the lights of the approaching automobile made it impossible for defendant's trainmen to observe the couple on its track in time to have stopped the train, regardless of its rate of speed, before running them down. The doctrine of the last clear chance has no application here, because the presence of deceased and his companion on the track was not discovered by the trainmen, for the reasons above stated, in time to avoid running over them.

For the reasons herein given, the judgment appealed from is reversed, annulled, and set aside; and plaintiffs' demands rejected and their suit dismissed, at their cost.

HAMITER, Judge (dissenting).

The decision announced in the majority opinion would be entirely correct if the accident in question had happened in an open country at a place which was devoid of human habitation. Here, however, the unfortunate tragedy occurred only 1,875 feet from the corporate limits of the city of Natchitoches, wherein the Louisiana State Normal College is situated, while defendant's train was speeding at the rate of 60 miles per hour. Many persons walk along the tracks at this location, going to and coming from their work in Natchitoches, and several well-defined footpaths are there, all to the knowledge of defendant and those who were in charge of the train. The neighborhood consists of approximately a dozen residences and several other buildings, is generally improved, and, therefore, may be said to be somewhat thickly settled. Two public roads cross the track in that locality. The majority opinion correctly and properly describes the community as a suburb of the city of Natchitoches.

Considering the facts and circumstances herein, it is my belief that the doctrines announced by the Supreme Court in Jones v. Chicago, R. I. & Pac. Ry. Co., 162 La. 690, 111 So. 62, 64, and Blackburn v. Louisiana Ry. & Nav. Co., 144 La. 520, 80 So. 708, 711, are applicable and controlling in the case at bar.

In the Jones Case the court said:

"The real question to be determined is whether the engineer is shown to have had knowledge of the fact that, in the particular place where the deceased was killed, the track was used daily as a pathway by pedestrians going and returning to their homes from that town, and that these people lived in the vicinity of Ruston near the railroad right of way. The proof is that the engineer was aware of these facts. Counsel for defendant relies upon the cases of Rogers v. L. R. & N. Co., 143 La. 58, 78 So. 237; and Tyer v. G., C. & S. F. R. Co., 143 La. 177; 78 So. 438.

"In the Rogers Case the court said:

" 'The place where the accident occurred is about 204 feet east of the crossing of the Alexandria & Western railroad, on the outskirts east of the city of Alexandria. On one side of the track is an open field, on the other side a thicket. There are no human habitations in that neighborhood, and there are no public roads near or crossing the railroad track. In other words, it is a place where no one would reasonably expect to find any human being between 10:30 and 11 o'clock at night.'

"There is a marked similarity in this case and the case at bar, in that in each case the engineer saw the object on the track when about 300 feet away, and did not discover that it was a human being until within about 50 feet away, when it was too late to avoid the accident; but there is a marked dissimilarity in the two, in that in the Rogers Case the body was on the track at a place where 'there are no human habitations in that neighborhood, and there are no public roads near or crossing the railroad track. In other words, it is a place where no one would reasonably expect to find any human being between

10:30 and 11 o'clock at night,' whereas, in the case at bar, the body of the deceased was on the track between two public crossings on the outskirts of the town of Ruston, where there were numerous habitations near the track, and where the track was commonly used as a pathway by pedestrians.

"In the Tyer Case the deceased was lying face down upon the track in the woods, remote from human habitation. No one would expect a human being to lie down upon the track in such a place. The engineer discovered that the object he saw was a human being when the locomotive was within 60 or 70 feet of it, when it was too late to stop the train in time to avoid the accident. The cases are not authority for holding that an engineer, after seeing an object on the track is, under all circumstances, justified in maintaining the speed of his train until he is satisfied that the object he has seen on the track is a human being. The location of the object, the public's use of the track, the proximity of habitations thereto, if within the knowledge of the engineer, are elements in determining whether or not, under the particular circumstances shown, the engineer was negligent, and whether he could by timely action have prevented the accident. There is no fixed rule in the jurisprudence of this state determining when the engineer shall stop his train after he discovers that some object, the nature of which he does not know, is on the track, but the opinions of this court in such cases are based primarily upon the special facts of each case. When it appears that the engineer knew that a portion of the track was used by pedestrians daily, and that these pedestrians lived near the right of way of the railroad, he must exercise greater caution in the operation of his train than will be required of him under other circumstances. * * *

"With these facts proven, and it appearing that the engineer had knowledge of them, the Court of Appeal held that the authorities relied upon by defendant's counsel do not apply, and that the failure of the engineer to exercise extra precaution to avoid injury to persons who might be on defendant's track at the point where the deceased was killed was negligence, for which the defendant is liable under the doctrine of the last clear chance. * * *

"We think the ruling of the Court of Appeal is correct."

We find the following in the Blackburn Case:

"In our opinion this case must turn upon the failure of the engineer or fireman to see deceased in time to stop and avoid striking him. As indicated heretofore, the active phases of his gross negligence were spent, and he was in such a position of apparent helplessness as to have been seen and his condition appreciated had the proper precautions been observed. It will not do for railroad companies to run their trains into and through thickly populated towns and cities, by depots and places where people are known to frequent, at such high rates of speed, their employees not seeing that which, by the exercise of ordinary care, they should see, and then be permitted to escape liability because of the inability of such employees to stop the trains when the danger is actually discovered. Under such circumstances, ordinary prudence should induce them to get their trains under such control as, with a careful watchout, they will be able to stop when necessary. In other words, increasing caution with danger, such speed only should be maintained as will enable them, with the light available, whether natural or artificial, to see persons or objects upon their tracks, and by the use of modern appliances to stop and avoid striking them, if the necessity should appear to a reasonable mind. If this were not required, they might as well pull the throttle open and go through at full speed, in so far as any good might result from an effort to stop when running at such a speed as would not permit it to be done after seeing the danger. This train was either running at such a rate of speed that it could not be stopped within the distance objects on the track could be seen, or the lights were defective, or the trainmen were not keeping a proper lookout. Whichever may have been the case, that was the proximate cause of the injury. If there were difficulties against seeing, this was all the more reason why greater care should have been used. At the place where Blackburn was killed, the railroad track was used as much as the street, to the knowledge of defendant and those in charge of the train. It was a case of the last clear chance, and the chance was, or should have been, with the defendant.

"We may add that both the deceased and the employees of defendant were guilty of the grossest negligence, the one in getting

drunk and lying down upon a railroad track, and the other in running through a populous town and frequented depot grounds, and a place where people might be expected to be, without exercising proper care. But Blackburn was no longer capable of exercising powers of discretion, and proper precautions by defendant would have discovered that condition, whereas the active negligence of defendant continued down to the time of striking deceased."

It is my opinion that under the circumstances, and by reason of the doctrines enunciated in the above-cited cases, defendant's train should have been under a control which would have permitted its being stopped in time to avoid the accident. Failure in this respect was the proximate cause of Pinckley's death.

Accordingly, I respectfully dissent.